*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re PERSON/HERNANDEZ, Minors.

UNPUBLISHED
December 7, 2023

No. 364990
Ingham Circuit Court
Family Division
LC Nos. 19-001487-NA;
          19-001488-NA;
          19-001489-NA

Before: LETICA, P.J., and HOOD and MALDONADO, JJ.

PER CURIAM.

Respondent-mother appeals as of right the order of the trial court terminating her parental rights to three of her minor children, TP, EP, and KH,[1] under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent).[2] We affirm.

## I. BACKGROUND

This case involves the termination of respondent-mother's parental rights to three of her children. According to the petition filed by petitioner, the Ingham County Department of Health and Human Services (DHHS), a Michigan State University police officer pulled over respondent-mother for an unregistered license plate in late November 2019. Respondent-mother admitted to the officer that she was drunk and did not have a driver's license. KH was inside the vehicle at the time. After failing sobriety tests, the officer arrested respondent-mother for operating the vehicle while she was intoxicated, driving with a suspended license, driving an unregistered or

---

[1] Respondent-mother has two other children not at issue in this appeal, NH1 and NH2. Her parental rights to NH1 were terminated in early December 2016, and NH2 has been under a full guardianship since late May 2017.

[2] Petitioner, the Ingham County Department of Health and Human Services, eventually filed a petition related to the father of TP, EP, and KH. His rights were terminated at the same time as respondent-mother's rights, but he is not involved in this appeal.

uninsured vehicle, and child endangerment. In the days after her arrest, Children's Protective Services (CPS) contacted respondent-mother several times about the events surrounding her arrest. During these conversations, respondent-mother admitted being intoxicated on the day of her arrest but claimed she went to jail voluntarily to sober up. She also denied that any of her children were in her care while she was drinking.

In late November 2019, approximately a week after respondent-mother's arrest, DHHS filed a petition requesting that the trial court exercise jurisdiction over TP, EP, and KH. After a preliminary hearing on the petition the same day it was filed, the court authorized the petition. In the order authorizing the petition, the court released the children to respondent-mother's custody under the supervision of DHHS. It ordered that respondent-mother could "not possess or use any alcoholic beverages, intoxicants, illegal drugs, or other illegal substances" and had to "submit to urinalysis testing as directed by the" assigned caseworker or juvenile court officer. At a late January 2020 hearing, respondent-mother admitted KH was present in the vehicle with her on the day she was arrested, and that she was arrested for, among other things, operating her vehicle while intoxicated. She also pleaded no contest to the allegations related to her statements to the CPS worker.

At a late February 2020 dispositional review hearing, Kevin Bucci, a juvenile court officer, testified that respondent-mother was participating in and complying with intensive neglect services (INS), substance-abuse treatment, and a parent support group. He also testified that she was submitting to drug screens. Bucci also indicated that although respondent-mother had two positive alcohol screens in January 2020, he believed the issue was addressed by home visits with a caseworker and respondent-mother's substance-abuse treatment. The court found that "reasonable efforts ha[d] been made," and ordered the "release[]" of the children to respondent-mother if she complied with the INS program.[3] At a late April 2020 review hearing, LaTia Scates, a caseworker with INS, confirmed that respondent-mother inconsistently participated in substance abuse treatment and that she was still testing positive for THC and alcohol. During a mid-July 2020 review hearing, Scates testified that although respondent-mother had tested "clean" in the drug screens she had taken, she missed "quite a bit of screens." And although respondent-mother contacted Scates to schedule make up screens, Scates expressed concern that doing so took "away from it being random screens."

In late August 2020, DHHS filed a petition to remove the children from respondent-mother's care. DHHS alleged that respondent-mother was not providing a safe environment for the children, asserting she was involved in a physical altercation with two men outside her residence, that there were online videos of TP riding a scooter "surrounded by men who were drinking, doing drugs, and surrounded by guns," and that she continued to test positive for drugs and alcohol. It also alleged that respondent-mother had not been compliant with her court-ordered services. At a late August 2020 hearing, Scates indicated respondent-mother failed to comply with INS and, despite being "set up with Soberlink so that she no longer needed to leave her residence"

---

[3] Bucci affirmed that, as of the February 2020 hearing, the INS program had been "successful thus far."

to test for alcohol, respondent-mother failed to comply and still tested positive. The court authorized the petition and DHHS removed the children from respondent-mother's care.

Between the August 2020 removal and the filing of the termination petition in August 2022, respondent-mother continued to miss drug screens and test positive for THC and alcohol. Though she had complied with her drug screens and other services as of the December 2020 review hearing, a case manager from Child and Family Charities, Kate Gove, reported at the mid-March 2021 review hearing that respondent-mother had completed only 14 of the 42 offered drug screens during that reporting period. After the March 2021 hearing, the court entered an order requiring the continuation of reasonable efforts, including individual drug screens, and for respondent-mother to comply with her service plan. At the early June 2021 review hearing, Mileidy Duran, the children's child welfare specialist, reported that respondent-mother was participating in parenting classes but "not engaging," and that she continued to test positive for THC and had recently tested positive for cocaine. In mid-June 2021, Duran moved for an order directing respondent-mother to show cause why she should not be held in civil contempt for failing to comply with the weekly drug screens. Accompanying her motion, Duran attached a list of 23 dates between mid-March 2021 and early June 2021 that respondent-mother was scheduled for drug screens. Of the 23, 19 were marked as "No show/No test," 3 were positive for THC only, and 1 was positive for THC and cocaine.

The trial court granted Duran's motion and in late July 2021 it held a show-cause hearing. At the hearing, respondent-mother admitted to not testing regularly and that she tested positive for THC when she did test. The court found respondent-mother in contempt and sentenced her to three days in Ingham County jail. It noted, however, that it would suspend her sentence if she was "compliant in [the] next 60 days." As of the late August 2021 permanency planning hearing, respondent-mother was drug testing three times a week and had only missed two drug screens since the show-cause hearing. Of the 15 tests respondent-mother took, none were positive for drugs. Duran testified at the hearing that respondent was also benefitting from parenting classes. The court found the goal of returning the children home appropriate and, although it left the decision whether to allow supervised or unsupervised visits to the discretion of the caseworker, the court encouraged "maximiz[ing] unsupervised visits . . . with an eye toward[] reunifications with in-home services." At the mid-November 2021 review hearing, Duran acknowledged that the primary barrier to reunification for respondent-mother was substance abuse. Duran testified, however, that respondent-mother had not tested positive for drugs or alcohol, that she had not missed any tests, and that she was completing the requirements for her substance-abuse treatment. And although Duran indicated that respondent-mother had previously declined to participate in counseling "due to previous trauma," respondent-mother, at the hearing, expressed a willingness to participate in individual therapy.

In mid-February 2022, at a review hearing, Duran reported that respondent-mother was compliant with services during the reporting period and confirmed that respondent-mother had been "sober for over one year from alcohol[.]" Duran indicated she was attempting to get the children placed back with respondent-mother. But at a late April 2022 review hearing, Duran testified that although there was a plan to return the children to respondent-mother with the Family Reunification Program (FRP), that changed after a FRP worker observed respondent-mother hit EP with a bag of bread. According to Duran, the worker also reported that respondent-mother "hit one of the dogs" and slapped one of the children. It appears that, at some point after this report

from FRP, DHHS changed the recommendation to continuing the placement with DHHS rather than allowing the children to return home.

At permanency planning hearing in early June 2022, the trial court ordered DHHS to initiate termination proceedings. During the hearing, Duran reported that unsupervised parenting time was suspended because the children reported that respondent-mother drove with them in the car without car seats. Duran confirmed that DHHS was concerned that respondent-mother had not benefited from the offered services and asked to change the permanency planning goal from reunification. At the end of the hearing, the trial court, relying on the fact that the children had been in care for over two years and respondent-mother was not benefiting from services, ordered DHHS to initiate termination proceedings against respondent-mother.

In early August 2022, DHHS filed a supplemental petition requesting termination of respondent-mother's parental rights under MCL 712A.19b(3)(c)(i), (g), and (j). DHHS requested termination based on respondent-mother's continued drug use and failure to comply with related services, her failure to comply with or benefit from other court-ordered services, and her history of providing an unsafe home environment for the children, including abuse against the children. DHHS sought termination because respondent-mother failed to benefit from her services and there was a continued risk of harm to her children if they were returned to her. The court authorized the petition a few days after it was filed.

The trial court held a two-day termination hearing in November 2022 and December 2022. Duran testified that DHHS sought termination of respondent-mother's parental rights "based on the [respondent-mother] participating in many service[s] and not benefiting from" them. She noted that respondent-mother was "still testing positive for THC and alcohol," which was a concern throughout this case. Duran also testified about the various referrals to respondent-mother throughout the case, including parenting classes, "substance abuse, parenting time, testing, and psychological counseling," and that respondent-mother had participated in Mid-Michigan Recovery Services (MMRS) treatment programs for drug and alcohol use, as well as substance abuse testing. She noted that respondent-mother was discharged from MMRS in early November 2020 because of a lack of attendance and participation, but was referred there again in mid-June 2021. Respondent-mother completed the MMRS service in mid-May 2022. But, according to Duran, respondent-mother had since tested positive for drugs and alcohol, including most recently in late October 2022 (approximately three weeks before the start of the termination hearing). According to Duran, respondent-mother disputed the positive screens for THC, having told Duran that "she don't do drugs and she don't understand why she's testing positive . . . ."

Dr. Randall Haugen, an expert in psychology and a psychologist with Battle Creek Counseling Associates, testified that he evaluated respondent-mother in September 2021. He assessed her "substance abuse issue," diagnosing her with a moderate alcohol-use disorder and "specific trauma and stressor disorder," the latter of which related to her "past history of trauma, her hyper-vigilan[ce], her tendencies to be reactive," and her "tendency to really numb her feelings

with alcohol . . . ." Dr. Haugen also testified that respondent-mother reported a "yearning for alcohol" and had a "history of starting and stopping . . . ."[4]

Respondent-mother testified at the hearing. She acknowledged that she was not supposed to be drinking alcohol but admitted that she had recently tested positive for alcohol. Respondent-mother claimed it was "an isolated incident," explaining that she "was drinking cough syrup for the last couple days . . . and that has alcohol in it." She testified that the last time she drank alcohol "recreationally or on purpose" was "like two years ago." Respondent-mother's therapist, Quenton Lerman, also testified as an expert in substance abuse and anger management therapy. Lerman testified that respondent-mother needed long-term therapy to work on "relapse prevention, continued use of substances, anger management, emotional regulation, and cognitive therapy," and that she would be an "ideal candidate for medication . . . ." He also testified about various recommendations from the psychological evaluation that respondent-mother had not been able to do.

After the testimony and closing arguments, the trial court issued a written order and opinion in which it found that petitioner established statutory grounds for termination pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). Regarding MCL 712A.19b(3)(c)(*i*), the court found that respondent-mother suffered from alcohol use and a personality disorder. It found that although she had "received multiple services over the years," she had not benefited from them. Though the court recognized that respondent-mother was in therapy and had made some progress, it noted that it would take years of long term therapy with medication to address her needs. It also noted respondent-mother's past lack of success with therapy due to her noncompliance. The trial court therefore found that it was unlikely respondent-mother would sustain two more years of treatment and that timeframe was "not a reasonable period to wait for circumstances to be rectified." Regarding MCL 712A.19b(3)(g), the trial court found that respondent-mother had the financial ability to provide for her children's needs, but that she "lack[ed] the capacity to make a commitment to maintain sobriety or gain a full awareness of how to keep her children safe." The court also relied on its findings under subsection (c)(*i*). Regarding MCL 712A.19b(3)(j), the trial court found that the children would be "subject to the effects of their parents['] unresolved substance abuse" and likely exposed to "criminality and violence" if placed in respondent-mother's home. It also found that termination was in each child's best interests. This appeal followed.

## II. STANDARD OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). We review for clear error the trial court's decision that statutory grounds for termination have been proven by clear and convincing evidence, as well as its determination that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "A trial court's decision is clearly erroneous if although there

---

[4] It is unclear from the record whether Dr. Haugen was referring to respondent-mother's history of starting and stopping drinking alcohol, or starting and stopping participation in treatment.

is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* "This Court gives deference to a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014).

## III. STATUTORY GROUNDS FOR TERMINATION

Respondent-mother argues that the trial court clearly erred when it terminated her parental rights under MCL 712A.19b(3)(c)(*i*) because although she had occasional positive tests for alcohol and THC throughout the case, there was no evidence she was consuming alcohol at the time of the termination hearing. We disagree.

The trial court terminated respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). But DHHS need only establish one statutory ground to support an order terminating parental rights. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds clear and convincing evidence of the following:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Termination is appropriate under MCL 712A.19b(c)(*i*) when the "totality of the evidence" supports a finding that the respondent-parent did not "accomplish[] any meaningful change in the conditions" that led to the adjudication. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). The court must also find that "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." MCL 712A.19b(3)(c)(*i*). What constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the children can wait for the improvements to occur. See *In re Dahms*, 187 Mich App 644, 648; 468 NW2d 315 (1991). "This statutory ground exists when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services . . . ." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014).

The trial court entered the initial dispositional order on February 26, 2020, and terminated respondent-mother's parental rights on January 9, 2023. The 182-day requirement of MCL 712A.19b(3)(c) was therefore satisfied here. The question is whether the trial court clearly erred by finding that there was no reasonable likelihood respondent-mother would rectify the conditions within a reasonable time considering the ages of TP, EP, and KH.

The conditions that led to adjudication were respondent-mother's substance-abuse problems and her related inability to provide a safe environment for her children. The trial court found that respondent-mother failed to make meaningful progress toward rectifying the conditions that led to adjudication because she "received multiple services over the years, but has not

-6-

benefited to the extent that she has a better understanding as to how her judgment affects the safety of her children." The court determined that "[p]rior attempts at therapy were unsuccessful due to Respondent's non-compliance," and that, while respondent-mother had made recent progress in taking "responsibility for her children being in care," it would "take long term therapy over the next several years with medication compliance to address [her] needs." The court concluded that "[i]t [was] unlikely the Respondent, after 7 years of Court intervention and services, [would] sustain two years of treatment." Notably, this conclusion incorporated respondent's history with the court and testimony regarding anticipated needs to achieve and maintain sobriety.

The trial court did not clearly err when it found clear and convincing evidence supporting termination under MCL 712A.19b(3)(c)(*i*). Throughout this case, respondent-mother failed to appear at numerous drug screens and continued to test positive for alcohol and THC, contrary to the requirements of her service plan. She continued testing positive for alcohol even after having "Soberlink" installed in her home to alleviate testing issues caused by a lack of transportation. At the termination hearing, Duran testified that respondent-mother was discharged from substance-abuse treatment in November 2020 because of her noncompliance. Duran also testified that even though respondent-mother was again referred to the substance-abuse treatment program in June 2021 and completed it in May 2022, she continued to test positive for THC and alcohol. This included a positive drug test approximately three weeks before the termination hearing.

To be clear, respondent's marijuana use was not the sole or even primary fact underpinning the trial court's statutory grounds finding. This Court has previously held that medical use of marijuana or otherwise lawful adult use of marijuana without evidence of harm to the child's life, health, or wellbeing is an insufficient basis to terminate parental rights or parenting time. See *In re Ott*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket No. 362073) (parent's use of marijuana did not justify automatic suspension of parenting time unless the trial court determined that the parent did not act in accordance with the Michigan Medical Marijuana Act (MMMA), MCL 333.26421 *et seq.*, or Michigan Regulation and Taxation of Marijuana Act (MRTMA), MCL 333.27951 *et seq.*, or unless the court determined that the parent's use created an unreasonable danger to the child); *In re Richardson*, 329 Mich App 232; 961 NW2d 499 (2019) (reversing termination of parental rights under MCL 712A.19b(3)(c)(*i*) and (g), where the evidence established that the parent had a lawfully issued medical marijuana card and used marijuana to treat her epilepsy, was not impaired when caring for her child, and unrefuted medical testimony established that marijuana was a valid treatment). Here, there was no evidence that respondent used marijuana for medical purposes, let alone with a valid medical marijuana card. There was evidence that her substance use placed her children at risk. The case began with her arrest for operating while intoxicated with one of her children in the vehicle. During the case, an online video surfaced of one of her children using a scooter around men using alcohol and drugs with firearms present. Instead of involving therapeutic or benign recreational use of marijuana, many of the crisis points in respondent's case involve her children being placed at risk due to drug and alcohol use.

The evidence also supported a finding that respondent-mother failed to provide a safe environment for the children, the other condition that led to adjudication, and that she failed to benefit from the services offered. The court found that previous attempts at therapy were unsuccessful because of respondent-mother's noncompliance, and that it was unlikely respondent-mother would "sustain two years of treatment" when she received "7 years of [c]ourt intervention

and services . . . ." At the termination hearing, respondent-mother's therapist, Lerman, opined that respondent-mother could not clearly define various types of abuse nor her responsibility for assuring a safe and stable environment for her children. Lerman also opined that respondent-mother would need long-term therapy and medication to address her issues with emotional regulation, substance abuse, and trauma. Respondent-mother also admitted to hitting EP in the head with a bag of bread, though she downplayed her actions as a "game" that she plays with him. She further admitted that she told the children she would "wh[o]op" them, again downplaying it as being "in a playful way," not in "a physical harmful way." Duran testified that CPS substantiated a claim that respondent-mother hit TP with a belt, and that respondent-mother's parenting time transitioned from unsupervised to supervised because of reports that respondent-mother hit TP and EP. Duran also reported that respondent-mother was consistently late to parenting time and that, more recently, respondent-mother had "miss[ed]" various parenting-time visits. Duran opined that respondent-mother did not benefit from parenting classes or visitation coaching sessions "based on her behavior."

Respondent-mother's conduct throughout this case demonstrated her failure to rectify her substance-abuse issues and her failure to provide a safe environment for the children. The conditions that brought TP, EP, and KH into care continued to exist despite substantial time for respondent-mother to make changes and take advantage of numerous services. See *White*, 303 Mich App at 710. We therefore are not definitely and firmly convinced that the trial court made a mistake when it found that termination of respondent-mother's parental rights was appropriate under MCL 712A.19b(3)(c)(*i*).[5]

We affirm.

/s/ Anica Letica
/s/ Noah P. Hood
/s/ Allie Greenleaf Maldonado

---

[5] Because only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, we need not address respondent-mother's arguments related to MCL 712A.19b(3)(g) and (j). *In re Ellis*, 294 Mich App at 32. And because we conclude that DHHS presented clear and convincing evidence supporting termination under MCL 712A.19b(3)(c)(*i*), we reject respondent-mother's due-process argument. See *In re Trejo Minors*, 462 Mich 341, 355; 612 NW2d 407 (2000) (stating that once DHHS "present[s] clear and convincing evidence that persuades the court that at least one ground for termination is established . . . , the liberty interest of the parent no longer includes the right to custody and control of the children").